IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 6, 2007

## DARNELL LAVELLE WELCH v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for  Tipton County**
**No. 4773  Joseph H. Walker, III, Judge**

---

**No. W2007-00290-CCA-R3-PC  - Filed November 16, 2007**

---

The petitioner, Darnell Lavelle Welch, appeals the post-conviction court's denial of his petition for post-conviction relief.  On appeal, he argues that he received the ineffective assistance of counsel. After a thorough review of the record and the parties' briefs, the judgment of the post-conviction court denying post-conviction relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Thomas T. Woodall and J. Curwood Witt, Jr., JJ, joined.

J. Barney Witherington IV, Covington, Tennessee, for the appellant, Darnell Lavelle Welch.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### BACKGROUND

The petitioner was convicted of premeditated first degree murder and was sentenced to life imprisonment.  This court affirmed the petitioner's conviction and sentence on direct appeal.  *See State v. Darnell Lavelle Welch*, No. W2004-01515-CCA-R3-CD, 2005 WL 2259123  (Tenn. Crim. App., at Jackson, Sept. 15, 2005).   The following is a summary of the facts of the case taken from this court's opinion on direct appeal:

> This case stems from the fatal shooting of the victim, Jeffrey Somerville, by the defendant in the early hours of July 13, 2003, in Covington.

Courtney Somerville was a cousin of the victim. He was with the victim from the evening of July 12th until just before the victim was shot. He stated that he saw the defendant approach a vehicle on North Main Street in Covington looking for Terrence Simpson. The defendant believed that Simpson had robbed the defendant's younger brother, Boo. The defendant asked Simpson to get out of the car Simpson was in. The victim and Courtney Somerville went across the street and intervened on Simpson's behalf. A general melee broke out and, according to Courtney Somerville, the defendant and his brother were "beat down." The defendant ran away and then returned, saying they would "take it to the Hill," meaning the Hill Street Apartments. The defendant and his brother were driving to Hill Street while Courtney Somerville and the victim were running in that direction. The defendant stopped on Valley Street and pulled a gun or guns from the trunk. The victim and his cousin took refuge in the victim's residence on Hill Street where the victim's mother, Beatrice Somerville, also lived. By this time, the defendant and his brother had already reached Hill Street and had guns. The city police were notified by a neighbor, Wynette Wilks, and an officer responded to the scene. The officer was not informed of the identity of the individuals causing a problem or any other details and left the scene. Later, the defendant returned on foot on a pathway. Courtney Somerville, the victim, and Beatrice Somerville were outside but returned inside the house when they saw the defendant. Courtney Somerville stated that the defendant was firing the gun in the air. Mrs. Somerville attempted to speak to the defendant, and the defendant told her that if she would move from the door, he would shoot both Courtney Somerville and the victim.

Acquavian Alston drove up and told the defendant to leave the area. The defendant told Alston that if Simpson would get out of Alston's car, he would kill him too. The defendant eventually left by way of the path he had arrived on. Later, the occupants of the Somerville house were again outside when the defendant, accompanied by Boo, returned in the defendant's car. Both the defendant and Boo were firing guns, and the Somervilles retreated inside. After this, the victim or Courtney Somerville sent for Victor Rudd to bring them a gun. Mr. Rudd brought a nine millimeter handgun and left it with the previously unarmed victim. Courtney Somerville walked to his home, which was located four houses down the street. Before he closed the door, he heard shots being fired and heard Beatrice Somerville yelling. Upon returning, he saw the victim on the ground in a pool of blood.

Kenneth Whitmore testified that he lived directly across the street from the victim. He had seen the defendant on Hill Street the night of the shooting, with a pistol in his hand and "having words" with the victim. The defendant was saying something about someone jumping on his brother, Boo. The defendant fired the weapon twice in the air and left. Later that evening, Whitmore saw the victim with a handgun. Whitmore later saw a vehicle, similar to the defendant's vehicle, pull up. Whitmore said he could not identify the driver. He heard four shots but said that he did not see

the victim "fire nary a shot." The car then left the area. Whitmore admitted he had given a statement to Investigator King saying that the defendant shot the victim, but he could not testify to that. He stated that he was standing within arms' reach of the victim when the victim was shot.

Aquavian Alston testified concerning an altercation that occurred on North Main Street, at approximately 11:00 p.m. on July 12th. The defendant approached Alston's car in an intoxicated state and addressed two of the occupants, Terrence Simpson and Terry Currin. The defendant was accusing the two of planning to rob his brother, Boo. Heated words were exchanged, and a fight broke out. The victim and Courtney Somerville joined in the fight. The victim struck the defendant more than once, and Courtney Somerville grabbed Boo in a headlock. The defendant ran away. Later that evening, Alston's sister, Wynette Wilks, called Alston and reported gunfire in her neighborhood on Hill Street. On his arrival, Alston saw the defendant firing a gun in the air. The defendant told Alston that he would kill Simpson if Alston allowed Simpson to get out of the car. Alston laughed at the defendant and told him to go home.

Wynette Wilks stated that she lived across the street from the victim. She had first seen the defendant with his brother after 1:00 a.m. on July 13th. Later, she saw the defendant drive by and fire the gun in the air. Later still, she observed the defendant addressing the victim, who was in his house. At that time, the defendant told the victim he was going to kill him.

Beatrice Somerville was the mother of the victim. She first saw the defendant drive by, shooting a gun. Later, she saw him approach on foot from the end of the street, holding a gun. She asked him what was going on. Addressing the victim, the defendant said if the victim's mother were not standing in the door, he would "let this m-f go and I'll go to jail, ain't going to do no time." Later, the defendant returned. Ms. Somerville said she saw the car, heard a shot, and saw the victim fall to the ground. She stated that she was unaware that her son had a weapon.

Officer Allen Willis, of the Covington Police Department, was on duty on July 12-13, from 10:00 p.m. to 6:00 a.m. He received a report of "shots fired" on North Main Street and went to the scene. A crowd of 150 to 200 people was present but was dispersing. He saw the defendant, who appeared angry to the officer, and the defendant remarked to others that "we're going to take this to the hood." The defendant left in his vehicle. At 12:55 a.m., Officer Willis received another report of "shots fired," this time at the Hill Street Apartments. He responded immediately to the scene. Several people were present, including the victim, Beatrice Somerville, Kenneth Whitmore, and Courtney Somerville. None would provide information on what had happened, and the officer left. Thirty minutes later, he received another call and returned to Hill Street. There he found the victim sprawled in the parking area

with a gunshot wound to his face. A handgun was found under a vehicle approximately ten feet from the victim's body.

Captain Larry Russell with the Covington Police Department, stated he encountered the defendant at 1:15 p.m., on July 13th, after the defendant had surrendered himself at the Tipton County Jail. During questioning, the defendant first denied shooting the victim, then said that he had shot the victim but that the victim had fired on him first. Initially, the defendant claimed he could not remember what he had done with his weapon but later stated that he had thrown it in a pond in Haywood County. The gun was not recovered.

Officer James A. King served as the investigator for the Covington Police Department. Other officers had secured the crime scene prior to Officer King's arrival. He noted that a semiautomatic handgun was under a vehicle, with its magazine about three feet away. No shell casings were found at the scene. He smelled the weapon for a scent of cordite and opined that the gun had not been fired recently. He stated that no tests were performed on the weapon. Officer King stated that he requested the coroner to perform a residue test on the victim's hands to determine if the victim had fired a weapon recently.

The defendant was questioned by Officer King and said that he went to the victim's neighborhood because the victim had been involved in robbing the defendant's brother. The defendant stated he was in the car when the victim shot at him, and he returned fire. Officer King examined the defendant's vehicle and found no bullet holes. The defendant stated that his weapon was a nine millimeter Ruger and that he had thrown it in a pond.

Dr. Teresa Allen Campbell, a forensic pathologist, had assisted in the autopsy of the victim. Dr. Campbell testified that the victim died of a gunshot wound to the face. She stated that she was unaware of any request to perform a residue test of the victim's hands, and no such procedure was done.

*Welch*, 2005 WL 2259123, at *1-3.

The petitioner filed a timely pro se petition for post-conviction relief. Thereafter, counsel was appointed, an amended petition was filed, and an evidentiary hearing was held. At the hearing, the petitioner asserted that he received the ineffective assistance of counsel. The petitioner testified that his counsel only met with him twice: once when he turned himself in, and once the day before trial. According to the petitioner, the initial meeting was about forty-five minutes in duration and he told counsel that he acted in self-defense – that the victim had a gun, "he shot first, then I shot back. And I had witnesses." The petitioner asserted that counsel did not "go question none of my witnesses or run a ballistics test on the gun or nothing . . . to prove self-defense and my side of the case." Specifically, the petitioner testified that he told counsel to interview his brother, Davelle

-4-

Whitley, and his cousin, Travis Stevenson, along with other witnesses who saw the victim and others jump on him before the shooting took place. The petitioner said that counsel did not interview or call any of these witnesses to support self-defense.

According to the petitioner, the second meeting occurred the day before trial and lasted only thirty minutes. The petitioner complained that counsel failed to discuss trial strategy with him. In fact, counsel only informed him that the district attorney was not going to ask for the death penalty, they were going to trial, and they were "going to try to fight it." The petitioner stated that counsel did not communicate any possible plea offers and did not discuss the possible negative consequences of going to trial as opposed to pleading guilty. The petitioner also stated that counsel did not discuss whether he should have testified or not at trial, and as a result, he did not testify at trial. The petitioner further stated that counsel did not properly cross-examine some of the state's witnesses and did not impeach them with their prior felony convictions. The petitioner also claimed that counsel should have used a ballistics expert to see if the gun found by the victim had been fired in order to prove self-defense.

On cross-examination, the petitioner conceded that potential witnesses, Davelle Whitley and Travis Stevenson, would have testified similarly to state witnesses that the victim and others jumped him on North Main Street which preceded the shooting on Hill Street. The petitioner denied shooting at the victim but acknowledged that he fired a shot into the air after the fight with the victim on North Main Street.

Davelle Whitley testified that he was never contacted by counsel or anyone from the Public Defender's Office. Mr. Whitley testified that he was with the petitioner the day of the shooting, but he did not witness the shooting itself. Mr. Whitley recalled that an altercation started on Main Street where he, the petitioner, and his cousin, got jumped by a group of guys. At the time of the initial altercation, Mr. Whitley did not observe anyone brandish weapons, and he did not hear any threats being made by either the petitioner or the victim. Afterward, he and the petitioner went home and heard gunshots. Later, the petitioner left the house for thirty minutes to go to a friend's house.

On cross-examination, Mr. Whitley admitted that after the shooting he left town and went to live in Arkansas. He made no attempt to contact the petitioner's counsel even though he knew his brother was being charged with murder. He conceded that he was unavailable to testify on behalf of the petitioner at his trial. According to Mr. Whitley, the petitioner never told him about "who shot him, or how he got shot, or anything like that." However, Mr. Whitley later acknowledged that the petitioner told him that the victim "shot at him and that he shot back, but [didn't] know if he shot him or not[.]" Mr. Whitley also insisted that the petitioner did not have multiple encounters with the victim before the shooting occurred.

Travis Stevenson testified similarly to Mr. Whitley. Mr. Stevenson added that he received a phone call informing him that the victim and the petitioner "got to shooting," and the victim got shot. Mr. Stevenson stated that he was available to testify but he was not contacted by counsel. Mr. Stevenson also stated that the petitioner did not pull out a gun at the altercation on Main Street. Mr.

Stevenson also stated that he did not believe the petitioner had multiple encounters with the victim before the victim was killed because the time span between the fight on Main Street and the shooting on Hill Street was only about forty-five minutes. However, Mr. Stevenson acknowledged that he had no personal knowledge that the encounters did not take place as testified by other witnesses at trial.

The petitioner's trial counsel testified that he met with the petitioner two or three times. He told the petitioner that he did not have "a self-defense." He indicated to the petitioner that a self-defense strategy was a "tough road to travel since indications were that he was the aggressor in the fight . . . [and] as the aggressor he would be hard pressed to rely upon the use of lethal force in self-defense when he was in the car, he was driving away, [he] could have left the scene." Counsel recalled that the petitioner told him that he shot at the victim, but he was not certain that he killed him. Counsel also recalled that the petitioner did not have an alibi, had turned himself in, and had given a statement to police. Regarding the petitioner's statement to police, counsel stated that he did not object to Officer Willis' testimony involving the statement because he believed the statement was spontaneous and was not terribly detrimental to the petitioner's defense.

Counsel admitted that he did not interview or call Mr. Whitley and Mr. Stevenson as witnesses. However, counsel stated that their testimony would have not helped the petitioner because their testimony pertained to events preceding the shooting but not the shooting itself. Counsel asserted that there were no witnesses found who could testify that the victim shot at the petitioner first. Counsel acknowledged that there was evidence that the victim had acquired a gun. Counsel also acknowledged that he did not request a ballistics test for the gun found near the victim because there was no indication that it had been fired.

Counsel acknowledged that there was evidence that the petitioner was the initial victim in the altercation on North Main Street. Therefore, he presented the petitioner's self-defense theory even though there was proof that the petitioner had several opportunities to cool down before shooting at the victim. He recounted that the state submitted no plea offer. He acknowledged that he did not perform an independent investigation of the crime scene because there were no cameras in the area where the shooting occurred. He did not know what happened to the petitioner's car and gun. Counsel noted that he discussed with the petitioner whether the petitioner should testify at trial.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In a written order, the post-conviction court held that the petitioner failed to prove his allegations by clear and convincing evidence.

**ANALYSIS**

On appeal, the petitioner claims that he received the ineffective assistance of counsel. In particular, he argues that counsel was ineffective because he failed to interview witnesses who observed the events leading up to the shooting incident and would have testified favorably at his trial.

-6-

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is de novo with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

In order to establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.*

Upon review, we need not address whether counsel's performance was deficient because it is clear from the record that the petitioner failed to prove his trial was prejudiced by any deficiency in the calling of witnesses. While both Mr. Whitley and Mr. Stevenson testified that they were present during an earlier fight which led up to the shooting, both witnesses acknowledged that they did not see the shooting. Testimony that the petitioner got into a fight with the victim prior to shooting him was presented by state witnesses at trial. Therefore, the testimony of Mr. Witley and Mr. Stevenson amounts to nothing more than corroboration of other witness testimony. Furthermore, Mr. Witley's and Mr. Stevenson's testimony may have proven harmful to the petitioner's case because their testimony could have been used by the state to show motive and thereby bolster its case that the petitioner acted with premeditation when he shot the victim.

Accordingly, we conclude that the post-conviction court properly found that the petitioner failed to prove his allegations by clear and convincing evidence, and the petitioner is not entitled to relief.

## CONCLUSION

The petitioner has failed to meet his burden of proof regarding his claim of ineffective assistance of counsel and the post-conviction court correctly denied the petition. Therefore, the judgment of the post-conviction court is affirmed.

_____
J.C. McLIN, JUDGE